JOHN LAMOND *vs.* THE SEA COAST CANNING COMPANY.

Washington.    Opinion March 22, 1911.

*Fish and Fisheries.    Injury to Private Weir.    Burden of Proof.    Damages.
Evidence.*

Evidence *held* to show that defendant threw refuse into a river so near plaintiff's fish weir that the refuse was carried into the weir by the tides, preventing fish from entering, and that such result might have been foreseen by reasonably prudent men.

The owner of a fish weir, suing for pollution of the river by defendant's depositing refuse therein, has the burden to show the prospective profits thereby lost to him.

In the absence of definite proof of damage caused plaintiff by pollution of his fish weir through defendant depositing refuse in the river, he is entitled to recover only the cost of removing the refuse.

On report.    Judgment for plaintiff.

Action on the case to recover damages alleged to have been caused by the unlawful act of the defendant in dumping into Passamaquoddy bay and the surrounding waters large quantities of decayed and refuse sardines packed in oil in such proximity to a fish weir lawfully maintained by the plaintiff, that the punctured cans were swept by the action of the tide into and around the plaintiff's weir and the fish thereby prevented from going into it.    Plea, the general issue.    At the conclusion of the evidence the case was reported to the Law Court for determination with authority to assess damages "in case judgment is in favor of the plaintiff."

The case is stated in the opinion.

*R. J. McGarrigle, and L. D. Lamond,* for plaintiff.

*Curran & Curran, and Pattangall & Plumstead,* for defendant.

SITTING :    EMERY, C. J., WHITEHOUSE, SAVAGE, SPEAR, KING, BIRD, JJ.

WHITEHOUSE, J.    In this action the plaintiff seeks to recover damages alleged to have been caused by the unlawful act of the

defendant in dumping into Passamaquoddy bay and the surrounding waters large quantities of decayed and refuse sardines packed in oil in such proximity to a fish weir lawfully maintained by the plaintiff, that the punctured cans were swept by the action of the tide into and around the plaintiff's weir and the fish thereby prevented from going into it. It is alleged in the plaintiff's declaration that between the first day of June, 1906, and August 8, 1907, the date of the writ, the defendant caused a great number of such cans of putrid sardines to be thrown into St. Croix river at different times, and that whereas prior to such unlawful acts on the part of the defendant, profitable fishing was done by the plaintiff's weir, immediately thereafter the water was so polluted by the escaping contents of these cans, that the fish entered the weir, if at all, only in such small quantities that the weir could not be profitably operated until the refuse material was removed.

In support of his contentions the plaintiff introduced evidence that in June, 1906, he removed from the weir 174 cans of refuse sardines some of which were marked "Sea Coast Continental cans," with "No. 24" stamped on the cover of the can; that the Paine Factory packed cans thus marked and numbered; that this factory was sold to the Sea Coast Packing Co. which continued to pack the Continental brand stamped No. 24, and that this company sold a part of the product to the Sea Coast Canning Co. the defendant in this case, and that it required the labor of two men five weeks to remove the decayed sardines and clean out the weir so that fish would enter it.

It further appears from the plaintiff's evidence that on the 13th day of July, 1907, the defendant's steamer G. B. Otis went up the St. Croix river, and when it arrived at the point opposite the plaintiff's weir and about 300 yards distant from it, a large number of loose cans and whole cases of refuse sardines were dumped from the steamer into the river. The next morning many of these cases and cans marked "Sea Coast Continental" were found on the weir, and they had to work four or five weeks to get them all out.

The plaintiff states that during two weeks in May, 1906, prior to the discovery of the refuse sardines in June, he realized from the fish

taken from his weir the sum of $244, and in the two weeks preceding the appearance of the refuse in 1907, the weir yielded $368; but it is claimed that in 1906, no fish were taken for "five or six weeks" after the appearance of the refuse sardines, and that in 1907, the plaintiff had his first good fishing after the refuse was removed, during the first week in September when he realized $384.

It is not in controversy that in 1906-7 some cans of refuse sardines were carried by the tide into the plaintiff's weir and interfered to some extent with the fishing, but it is contended in behalf of the defendant, first, that the defendant cannot be held legally responsible for the appearance of the refuse sardines in the plaintiff's weir, and second, that if he can be deemed liable the evidence utterly fails to afford any reliable data from which the amount of the plaintiff's loss can be determined with any reasonable certainty.

With respect to the first proposition it is admitted that in the year 1906-7, the defendant dumped into the Pembroke river, five or six miles from the plaintiff's weir, between 1500 and 2000 cases containing 100 cans each of refuse sardines; but it is claimed that it could not reasonably be anticipated by any prudent man that cans thrown into the bay at that point would ever be carried into the plaintiff's weir; and the plaintiff himself says, that he does not see "how it would be possible" for cans dumped at that point to get over to his shore.

The defendant strenuously denies, however, that any refuse sardines were dumped into St. Croix river in 1906-7; and the captain and mate of the defendant's steamer G. B. Otis, specifically deny that any cases or cans of sardines were thrown from the steamer into the St. Croix river on the 13th day of July, 1907. Upon this issue there is a sharp conflict of testimony. But after a careful examination of all the evidence, including the identification of the marks upon the cans, it is the opinion of the court that the weight of evidence supports the contention of the plaintiff that large quantities of refuse sardines were thrown into St. Croix river at a point so near the plaintiff's weir that the cases and cans were carried into it by the ordinary action of the tides, and to some extent prevented the fish from entering it, and that under the circumstances

disclosed it might have been anticipated by reasonably prudent men that such would be the result.

But upon the second proposition set up by the defendant, it is earnestly contended that the plaintiff suffered no loss from the failure of the fish to enter his weir during the weeks in question, as the result of the defendant's unlawful acts for which, upon the evidence now before the court the damages can be estimated with reasonable certainty and legally awarded to the plaintiff in this action.

Upon this branch of the case a witness for the plaintiff named Gleason, who operated a weir about half a mile below the plaintiff's on the same shore testified in cross examination that "there are weeks without any oil or rotten sardines to interfere, that fish do not come there in enough quantities to fish it," that "that is true of every weir on the shore there," and that "you can't tell how much a weir would stock in July by figuring what it stocked in June." This testimony was corroborated by the reluctant admissions of the plaintiff himself and by the explicit testimony of Frederick Morrison, who was employed by the plaintiff in 1907 and appeared as a witness in his behalf. Harmon Cook, another witness for the plaintiff who owned and operated a weir about 1500 feet above the plaintiff's stated on cross examination that the plaintiff had good fishing all through the month of June, 1906 ; that "there are weeks when your weirs don't fish profitably ; that they wont fish when there are no herring, and there are weeks when there are no herring."

The burden was upon the plaintiff to establish by evidence the prospective profits of which he claimed to have been deprived by the unlawful act of the defendant. They cannot be estimated by the court without reasonably definite and reliable evidence to justify the finding. In view of the testimony in this case showing the irregularity with which the fish enter these weirs without any apparent reason therefor, the plaintiff himself has not attempted to make any estimate of his damages. The only analogous case to which the attention of the court has been called in which the right of the plaintiff to recover for the loss of profits from his business of fishing

was brought directly in question, is that of *Wright* v. *Mulvaney*, 78 Wis. 89, (46 N. W. 1045).

In that case the plaintiff had a "pot net" or "pound" set in the river, which was injured by the defendant's steam tug. The testimony tended to show that before the injury the plaintiff derived a profit of from $40 to $50 per day every alternate day, and that it would have required about ten days to restore the injured net, had it been restored. No other testimony was introduced bearing upon the question of profits, and the jury assessed the damages for profits at $200. But the court held that such prospective profits were not recoverable upon this evidence. In the opinion it is said: "There was no testimony as to whether the conditions of successful fishing remained for ten days after the injury as favorable as they were immediately before the same,—none to show that the weather continued favorable during the ten days; that storms did not intervene to interrupt the business; that the fish continued to run over the same grounds in equal abundance; that other fishermen operating in the vicinity were equally as successful in their business after as before the injury; nor that the market price of fish remained as high. Without any testimony concerning these essential conditions, the jury must have made their assessment of damages of plaintiff's business largely upon mere conjecture. They must have assumed without proof that a business proverbially uncertain in results depending for its success upon numerous conditions which the persons engaged therein cannot control or influence, and the presence or absence of which at a future time cannot be foretold with any degree of accuracy, would have continued after the net was injured to be just as profitable as it was before the injury. Such an assumption under such circumstances, is unwarranted in the law, and probably we should be compelled to reverse this judgment for want of sufficient evidence to support the assessment of damages for profits, even though it should be held that, under proper proofs, the plaintiff might recover prospective profits. But we are of the opinion that prospective profits cannot properly be awarded as damages in this case. The reason therefor has already been suggested, which is that under any state of testimony, in view of the character and condi-

tions of the business, the jury could have no sufficient basis for ascertaining such prospective profits. At best, the assessment thereof must necessarily rest largely upon conjecture. This feature of the case brings it within the rule of *Bierbach* v. *Goodyear Rubber Company*, 54 Wis. 208, and *Anderson* v. *Sloan*, 72 Wis. 556, and the cases cited in the opinion therein."

See also 13 Cyc. 56, 57; *Ferris* v. *Comstock*, 33 Conn. 513, and *Barton* v. *Erie R. Co.*, 73 N. J., Law 12, (62 Atl. 489).

It will be noticed that in the case at bar there was not only positive evidence from the plaintiff's own witnesses of the uncertainty and irregularity of the weir fishing on that shore but substantially the same absence of testimony described in *Wright* v. *Mulvaney*, supra, showing that the conditions for successful fishing were as favorable immediately after the injuries as they were immediately before. The principle applied in that case must accordingly be accepted as decisive of the question of prospective profits in the case at bar.

But in that case the plaintiffs were allowed by the court to retain the damages awarded them by the jury for the cost of repairing the injured net and the value of the services of the plaintiffs and their employees in resetting it. In the case at bar the plaintiff is entitled to recover as damages the fair value of his own services and that of his "hired man" in their reasonable endeavor to remove the obnoxious refuse from the weir and make the operation of it successful and profitable. It appears from the undisputed evidence introduced by the plaintiff that it required five weeks in 1906 and four weeks in 1907 for himself and his assistant to clean out the weir. But they labored only during those portions of the day when the tide was favorable, and it is the opinion of the court that a reasonable compensation for their services would be $3.00 per day in the aggregate, amounting to $90 for the year 1906, and $72 for the year 1907, and that the plaintiff is entitled to recover these sums with interest from the date of the writ.

The certificate will accordingly be,

*Judgment for the plaintiff for $162,*
*with interest from August 8, 1907.*